173 N.J. Super. 240 (1980)
413 A.2d 998
IN THE MATTER OF THE ESTATES OF PILAR FERNANDEZ AND LUIS FERNANDEZ.
Superior Court of New Jersey, Law Division  Probate Part, Essex County.
Decided March 5, 1980.
*241 Raymond G. Tomaszewski for proponent.
Stephen N. Maskaleris for Caveator.
YANOFF, J.S.C.
The crucial issue here is whether the will of Pilar Rodriguez Fernandez (Pilar) was validly executed. The issue arose because Giovanna Trupia (Giovanna), Pietro Trupia, the father (Pietro) and Vincenza Trupia (Vincenza), whose names appear as witnesses on the will, refused, in the surrogate's office, to execute affidavits that they had witnessed the execution of the will. The surrogate found doubt on the face of the will. The matter then was referred to the Superior Court pursuant to N.J.S.A. 3A:2-3 to 5 and R. 4:84-1(d) and (e).
Offered for probate were the wills of Pilar and Luis Fernandez (Luis), her husband. Luis bequeathed his entire estate to Pilar, and died April 10, 1979. Pilar died June 26, 1979. Both deaths occurred after September 1, 1978, the effective date of the probate code (N.J.S.A. 3A:2A-1 et seq.).
Both wills were executed at the same time and under the same circumstances. I have concluded that both wills should be admitted to probate. Nevertheless, it should be noted that since there is no evidence that Luis was survived by issue or parent, Pilar takes Luis's estate by intestacy (N.J.S.A. 3A:2A-34), if not by will.
The genuineness of Luis' and Pilar's signatures on the wills is not disputed, nor is it denied that the names of Giovanna, Pietro and Vincenza Trupia appear in the places usual for witnesses to *242 sign. It is asserted, however, by the Trupias that the testator and testatrix did not declare the respective writings to be their last wills, that the witnesses were not asked to be witnesses to wills, and that the witnesses affixed their signatures not knowing they were acting as witnesses to wills, and that, therefore, there was compliance with neither N.J.S.A. 3A:3-2 (the former statute) nor N.J.S.A. 3A:2A-4 (the present statute). It is urged, also, that since the wills were executed in August 1978, N.J.S.A. 3A:2A-4 does not apply, despite the fact that Pilar died after its effective date.
Maria del Carmen Rodriguez (Maria), niece of Pilar, and Javier Perez Lopez (Javier), her husband, are the beneficiaries of both wills. Pilar and Luis were next door neighbors to the Trupias. Maria and Javier testified in support of the wills. I accept their testimony as substantially accurate, even though I recognize their interest in the outcome. I come to this conclusion partly because of my impressions of their personalities, partly because of certain uncontradicted facts, and partly because the Trupias, who testified in opposition, were in my judgment utterly incredible.
I therefore find the following facts: The wills were prepared by Joseph Taboada, Jr. (Taboada), a member of the New Jersey Bar. Javier obtained the wills in a sealed envelope which he brought to Maria. Taboada gave either Javier or Maria instructions as to how the wills were to be executed. I am not able to find that he told them how to comply with N.J.S.A. 3A:3-2 (the former statute). The envelope was opened in Maria and Javier's presence, and at that point they learned, if they did not already know, that the instruments were wills. Despite a dispute between the Fernandezes and the Trupias by reason of a boundary fence, Pilar called to Pietro, whom he saw in the yard, to come with his family to witness the wills. Pietro summoned Giovanna and Vincenza and the three went to the Fernandez home where they and Maria and Javier saw Luis and Pilar sign the wills. Before the Trupias affixed their signatures, Vincenza read the *243 instruments and told them it was all right to do so. The facts do not show that testator and testatrix used the customary language declaring the respective instruments their wills, but it is certain that all present knew that Luis and Pilar were signing their wills and that the Trupias were witnessing their signatures.
The instruments themselves, with the signatures thereon, are objective facts supporting this conclusion. The opening paragraph states that the instrument is a will, as does the backer. The words "Last Will and Testament" appear on the page which bears the witnesses' signatures in the case of Pilar's will, and the word "Testament" appears on the equivalent page of Luis' will. The paper is stiff and heavy. Even an untutored person must have realized what they were.
The native tongue of the Trupias is Italian. However, they have some knowledge of English. It was necessary to have an Italian interpreter for Giovanna and Pietro. But Vincenza and her brother Vincent, who also testified, have fluent command of English. Vincenza has a considerable knowledge of Spanish and Pietro knew some Spanish. Luis and Pilar knew English and Spanish. Maria knew only Spanish. Javier knew Spanish and a few words of Italian. All communicated in a melange of languages and by signs. It is not conceivable that Vincenza would have permitted her mother and father to sign, nor would she have signed herself, without knowing what they signed.
The explanation for the incredible nature of the Trupias' testimony is that in some undisclosed manner Vincent obtained a substantial amount of stock and some bank books from the Fernandezes. Since ostensibly they have no interest in the outcome of the litigation, the only explanation is that the Trupias believe that Vincent will have an advantage if the wills are not admitted to probate. Clearly, they are personally hostile to Maria and Javier.
The formal requirements for the execution of a will were stated in In re Hale's Will, 21 N.J. 284 (1956):

*244 Literal compliance with regard to publication means that `in the presence of 2 witnesses present at the same time' there must be some conscious indication by the testator, unmistakable in its import, that the act he is about to perform is, or the act he has performed was, the signing of his last will and testament. The declaration may take the form of an expression by the testator himself to the required effect; or it may be a statement by the scrivener or some one else acting for the testator in his presence and positively acquiesced in by the testator, that the testator's last will is about to be signed or has been signed by him. In cases of indirect publication it must be under such circumstances as to leave no room for doubt that the testator clearly understood the nature of his act and that he wished the persons to whom it was declared to know that he was executing or had executed his last will. [at 296, 297]
To the same effect, 5 N.J. Practice (Clapp, Wills and Administration) (3 ed. 1962), § 41, at 106. In In re Hale's Will, 21 N.J. at 295, 121 A.2d 511, and In re Taylor, 28 N.J. Super. 220, 225 (App.Div. 1953) "substantial compliance" with the dictates of the statute was explicitly disapproved. In re Petkos, 54 N.J. Super. 118 (App.Div. 1958), certif. den. 30 N.J. 150 (1959), may be read as presenting a less literal view. However, the facts in that case were stronger than they are here. There, the testator signed the will in the presence of the scrivener-lawyer and another witness. Before the testator signed, the lawyer said, "[This is] the last will and testament of [Mr. Petkos]." The lawyer and the other witness then affixed their signatures. Judge Conford said (at 124) that to deny probate would "come close to substituting a fetish for a rule of reason."
In the 1975 pocket part to 5 N.J. Practice, supra, § 41, n. 11, Judge Clapp states:
However, it is ventured that today New Jersey courts would hold that substantial compliance with the Wills Act is sufficient. For authorities in other jurisdictions see 2 Page, Wills, § 19.4 (Bowe, Parker ed. 1960); Atkinson, Wills, p. 293 (2d ed. 1953; Langhelm, `Substantial Compliance with the Wills Act', 88 Har.L.Rev., 489 (1975).
*245 Yet, were I to rule that the wills be admitted to probate because of substantial compliance with the Wills Act, I would be breaking new ground, a role more appropriate to appellate courts.[1]
The new statute originates in the Uniform Probate Code. It reads:
3A:2A-4. Execution
Except as provided in section 5., every will shall be in writing, signed by the testator or in his name by some other person in his presence and at his direction and shall be signed by at least two persons each of whom witnessed either the signing or the testator's acknowledgment of the signature or of the will.
Here we have substantial, but not precise, compliance with the N.J.S.A. 3A:3-2 (the former statute). Lacking for precise compliance are publication by the testator and a request that the will be witnessed.
A determination either that substantial compliance is now sufficient or that it is not, would not completely answer the question before me because it would leave unanswered whether the applicable statute is N.J.S.A. 3:2A-4, the statute effective on September 1, 1978 before the deaths of Luis and Pilar.
The new statute relaxes the requirements of the former statute. It does not require that the "making thereof [be] acknowledged by [the testator] and ... declared to be his last will ...," or that the witnesses be present at the same time. In the 1979 pocket part to 5 N.J. Practice, supra § 41, Judge Clapp quotes from the Official Comment on this section in the Uniform Probate Code:

*246 The formalities for execution of a witnessed will have been reduced to a minimum. Execution under this section normally would be accomplished by signature of the testator and of two witnesses; each of the persons signing as witnesses must `witness' any of the following: the signing of the will by the testator, an acknowledgment by the testator that the signature is his, or an acknowledgment by the testator that the document is his will ... There is no requirement that the testator publish the document as his will, or that he request the witnesses to sign, or that the witnesses sign in the presence of the testator or of each other. The testator may sign the will outside the presence of the witnesses if he later acknowledges to the witnesses that the signature is his or that the document is his will, and they sign as witnesses....
The Uniform Probate Code makes provision for the problem presented here, specifically providing in § 8-101:
........
(b) Except as provided elsewhere in this Code, on the effective date of this Code:
(1) the Code applies to any wills of decedents dying thereafter;
........
Our own statute contains no such provision. Cases in states which adopted the Uniform Probate Law or had similar statutes which were made specifically applicable to probate proceedings after the effective date of the statute, of course held that the law in force at the time of death controlled. Floerchinger v. Williams, 260 Iowa 53, 148 N.W.2d 410 (Sup.Ct. 1967); In the Matter of the Estate of Buffi, 98 Idaho 354, 564 P.2d 150 (Sup.Ct. 1977). In Hardy v. Ross, 237 Ark. 76, 371 S.W.2d 522 (Sup.Ct. 1963), there was, however, no statute similar to the Uniform Probate Code provision quoted above. There, testatrix executed a will at the age of 18 when the statute in force permitted only persons 21 years of age to make wills. At the time of her death the statute had been amended to provide that persons 18 years of age were capable of making wills. The court held the will valid, quoting from the Alabama case of Hoffman v. Hoffman, 26 Ala. 535 (1855):

*247 `... when its object is, not to abridge, but to enlarge the privileges of the testator, and to give effect to his will, then it falls within the principle by which devises, made in words which, by Legislative construction alone, include lands subsequently acquired, are extended to wills made before the law took effect.' [at 523]
Accord, In re Spain's Estate, 327 Pa. 226, 193 A. 262 (Sup.Ct. 1937). To the same effect is the Annotation in 111 A.L.R. at 910, "Wills  Retrospective Statutes," distinguishing between "Statutes augmenting requirements" (at 915) and "Statutes reducing requirements," in which it is stated:
In most cases statutes dispensing with formalities formerly required in the execution of wills have, upon one ground or another, been applied retrospectively, where the effect has been to validate the wills of testators who were alive when the statutes were adopted. [at 919]
There are older cases which support that statement, e.g., Langley v. Langley, 18 R.I. 618, 30 A. 365 (Sup.Ct. 1894); In re Learned, 70 Cal. 140, 11 P. 587 (Sup.Ct. 1886). Contra, e.g., Appeal of Lane, 57 Conn. 182, 17 A. 926 (Sup.Ct.Err. 1889); Packer v. Packer, 179 Pa. 580, 36 A. 344 (Sup.Ct. 1897). Cf. In re Estate of Kavcic, 341 So.2d 278 (Fla.D.Ct.App. 1977), holding that where subsequent law makes formalities as to execution more onerous, law at time of execution controls, e.g., Barker v. Hinton, 62 W. Va. 639, 59 S.E. 614 (Sup.Ct. 1907). For a case holding contra, see Western Maryland College v. McKinsley, 75 Md. 188, 23 A. 471 (Ct.App. 1892).
A will is ambulatory and speaks only as of testator's death. Bartel v. Clarenbach, 114 N.J. Super. 79, 85 (Ch.Div. 1971); Varick v. Smith, 69 N.J. Eq. 505, 512 (Ch. 1905). In Varick it was held that an anti-lapse statute enacted after the date of the execution of the will, but before testatrix' death, controlled disposition of property under the will. Similarly, in Miller v. Reich, 134 N.J. Eq. 28 (Ch. 1943), it was held that the will of a married woman made at a time when she was incapable of devising real estate did in fact pass real estate, because she died *248 after the effective date of a statute giving a married woman power to do so. Cf. Mundy v. Mundy, supra, which involved the effect of a statute changing the formalities of will execution and held that whatever sufficed under the old law satisfied also requirements of the new law.
The logic of principle that a will speaks as of the death, exemplified in the foregoing New Jersey cases, points strongly towards holding that the new statute which diminishes the requirements for will execution is controlling. Even more persuasive is the fact that N.J.S.A. 3A:2A-1 et seq. is a comprehensive revision of New Jersey probate law designed to simplify and facilitate the making of wills and administration of estates. Were there to be a holding that its execution provisions applied only to wills made after the effective date of the statute, the benefits of the new law would be denied to all those who executed wills before September 1, 1978. It is not conceivable that the Legislature had any such intention. Cases such as those cited above, which take the view that a subsequent statute has no retrospective application, do so on the theory that vested interests are created by the will. In my view this is completely inconsistent with the settled law in this State that a will is ambulatory. It would be anomalous to follow such precedents in this State.
The wills shall, therefore, be admitted to probate.
NOTES
[1] The facts in Mundy v. Mundy, 15 N.J. Eq. 290 (Prerog.Ct. 1858), approximate those in this case, and probably the Ordinary there would have admitted these wills to probate under the former statute, but I read In re Hale's Will, supra, as making the requirements more stringent.